## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                                     :
UNITED STATES OF AMERICA,                                            :
                                                                     :
 v.                                                             :        Case No. 19-cr-00714 (VM)
                                                                     :
DOV MALNIK,                                                          :
                                                                     :
            Defendant. :
                                                                     :
                                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

### SENTENCING SUBMISSION ON BEHALF OF DOV MALNIK

**WILLKIE FARR & GALLAGHER LLP**
Michael S. Schachter
Randall W. Jackson
Jordan D. Reisch
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendant Dov Malnik*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

DISCUSSION .............................................................................................................5

I.    THE PROBATION DEPARTMENT RECOMMENDED A SENTENCE OF
TIME SERVED AND SUCH A SENTENCE WOULD BE APPROPRIATE FOR
A MAN WHO HAS ALREADY BEEN SIGNIFICANTLY PUNISHED. ......................5

II.   A BALANCED CONSIDERATION OF ALL RELEVANT FACTORS UNDER
18 U.S.C. § 3553(A) DEMONSTRATES THAT A SENTENCE OF TIME
SERVED IS SUFFICIENT BUT NO GREATER THAN NECESSARY TO
ACHIEVE THE GOALS OF SENTENCING....................................................................6

      A.   Dov Malnik's History And Character......................................................6

           1.   Dov's Upbringing, Education, And Athletic Achievement. ........................7

           2.   Dov Begins His Career, Moves To Switzerland, Meets His Wife,
And Starts A Family. .......................................................................11

           3.   Dov's Character. ............................................................................14

           4.   Dov's Arrest And The Harsh Conditions of Dov's Incarceration ............17

           5.   Dov's Home Confinement In The United States. .....................................23

      B.   Any Additional Period Of Incarceration Will Impose Substantial Burden
On Dov's Wife And Young Children. .................................................................24

      C.   A Sentence of Time Served Is Appropriate in Order To Avoid
Unwarranted Disparities With Comparable Cases. .............................................28

           1.   Dov Has Already Been Punished More Severely Than Other
Members Of The Same Alleged Insider Trading Scheme. ........................28

           2.   Many Other Recent Insider Trading Sentences In This District
Have Been Substantially Below Guidelines. ...........................................31

           3.   The Danger Of Sentencing Disparity Is Greatly Enhanced By
Virtue Of Dov's Non-Citizen Status....................................................34

      D.   A Sentence of Time Served Will Be More Than Sufficient To Achieve
The Goals Of Specific And General Deterrence...................................................37

CONCLUSION.........................................................................................................40

# TABLE OF AUTHORITIES

Cases                                                                              Page(s)

*Gall v. United States,*
    552 U.S. 38 (2007)...................................................................................................3, 6

*United States* v. *Bills,*
    401 Fed. Appx 622,624 (2d Cir. 2010)...............................................................24

*United States v. Brennan,*
    395 F.3d 59 (2d Cir. 2005)....................................................................................29

*United States v. Chin Chong,*
    No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y Sept. 24, 2014)............................37

*United States v. Chow,*
    17-cr-667, Dkt. 161 (S.D.N.Y. Jan. 17, 2019)................................................25, 40

*United States v. Connolly,*
    16-cr-370 (S.D.N.Y. Nov. 19, 2019) ...............................................................36, 37

*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010)..................................................................................29

*United States v. Gupta,*
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)......................................................2, 3, 6, 37

*United States* v. *Isola,*
    548 F. App'x 723 (2d Cir. 2013) ..........................................................................24

*United States.* v. *Johnson,*
    964 F.2d 124 (2d Cir. 1992)..................................................................................25

*United States v. Millul,*
    18-cr-579 (S.D.N.Y. Aug. 27, 2019) ....................................................................37

*United States v. Velazquez,*
    No. 16-cr-233, 2017 WL 2782037 (S.D.N.Y. May 26, 2017)...............................40

**Statutes**

18 U.S.C. §3553(a) ................................................................................ *passim*

Defendant Dov Malnik respectfully submits this memorandum in connection with his sentencing, which is currently scheduled for November 19, 2021.

## PRELIMINARY STATEMENT

Dov Malnik stands before this Court having accepted responsibility for his actions. In addition to this submission, Dov has written a personal letter to Your Honor, expressing his deep remorse for his conduct, in his own words. That letter is attached at Ex. A-1.

Dov, unlike most defendants being sentenced for insider trading, has already been significantly punished for his actions. To date, he has already spent *eight months* imprisoned in a maximum security Swiss prison, under extremely difficult conditions, and since arriving in the United States, this past June, he has been confined to a New York apartment, many thousands of miles away from his wife and two small children. While European prisons have a reputation for being more comfortable than those in the United States, Dov's experience was notably *worse* than the treatment given to most incarcerated persons in America. Despite being a first offender, with absolutely no history of violence, Dov was placed in a maximum security facility, where he spent 23 hours a day in his cell. For the first *seven weeks* of his incarceration, he was not permitted to make a single phone call to his wife or his children. For months, the prison did not allow Dov to see his son ▇▇▇, age 4, and baby daughter ▇▇. Dov had been incarcerated for almost four months when he finally saw his son, and even then, their visit was through a Plexiglass screen. Dov missed baby ▇▇ first steps and her first words; he saw her only once during the entire eight months of his incarceration in Switzerland. Although Dov had spent nearly every day with his young daughter prior to his arrest, Dov was a stranger to ▇▇ after so many months behind the prison walls. And although Dov has been granted bail here in the United States, the terms are understandably strict and demand confinement in a rented New York apartment, far away from Dov's home and family. In short, Dov stands now before Your Honor,

with the humility that comes from having spent the last thirteen months without his freedom or his family.  Presumably in recognition of the fact that Dov has *already* been significantly punished, the Probation Department has recommended a sentence of **time served**, plus a three-year term of supervised release, with the special condition of 12 months' home confinement, 300 hours' community service, and a fine in the amount of $75,000.

　　　　　We submit that a sentence of time served would be appropriate in this case.  Dov is, despite the mistakes that led him here, a fundamentally *good* man.  He and his wife, Celine, a schoolteacher, have been together for more than fifteen years.  Prior to his incarceration, Dov served as the ██████████  ███████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████.  As the many letters enclosed with this submission illustrate, ████████████████████████████████████████████ ██████████████████████████████████.  Indeed, more than *100 people* have written to the Court, on Dov's behalf, in an attempt to try to convey to Your Honor what kind of person Dov is, separate from his mistakes, and to impart how Dov's warmth and sensitivity have helped them endure some of the most trying times in their lives.  (*See* Ex. A (Letters to Judge Marrero)).[1]  As the letters make clear, and as we attempt to describe in further detail below, Dov's life has been, in many ways, defined by his devotion to his responsibilities, first as a son to his hard-working parents, then as an older brother to two younger siblings, as a teammate to his peers on the athletic field, as a colleague to his co-workers, and of course, more recently, as a husband to Celine and a father to ██████ and ████.  We submit that in deciding a fair and just

---

[1] The compilation of letters is attached as Exhibit A.  For the Court's convenience, each letter is individually numbered.  Citations to specific letters in this memorandum are referred to as A-[Number].

sentence, Dov's demonstrated history of empathy and support for others should merit meaningful consideration.

Sentencing a person requires "great care and sensitivity" because the "facts and factors" that must be weighed are numerous and important.  *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).  While a sentencing court is required to "correctly calculat[e] the applicable Guidelines range," *see Gall v. United States*, 552 U.S. 38, 49-50 (2007), that calculation falls "second" to "the bedrock" of federal sentencing, 18 U.S.C. § 3553(a), which provides that a sentencing Court shall "impose a sentence that is sufficient, but not greater than necessary" after considering:  (1) the history and character of the defendant; (2) the nature and circumstances of the offense; (3) the need to protect the public from further crimes of the defendant; (4) the need to afford adequate deterrence; and (5) the need to avoid unwarranted sentence disparities.  *Gupta*, 904 F. Supp. 2d at 350, 353-54.

As these factors reflect, sentencing bestows a "moral responsibility" to "judge the man as a whole."  *Id*.  That is because good people can, and do, make bad choices; it is their reaction to those mistakes that reveals their character.  Dov has taken full responsibility for his actions.  He is not making excuses or blaming others.  In addition to pleading guilty, Dov has come to an agreement with the Enforcement Staff of the Securities and Exchange Commission ("SEC") to pay more than $2.8 million as a penalty for his wrongful trading.  And, Dov has already been punished more harshly than the others who engaged in the same offense.  Although Dov accepts this Court's determination of an appropriate sentence and understands that the Court will make a fair and just determination, Section 3553(a)(6) requires consideration of how equivalent defendants have been sentenced and militates against unwarranted sentencing disparities.  Here, Dov has admitted to trading securities after receiving information from a trader

named Marc Demane-Debih, who, the Government has described as having "tertiary" role.  (Ex.
S at 13).  Others involved with Demane-Debih have already been sentenced.  For example,
Bryan Cohen, a former investment banker at Goldman Sachs, pled guilty, and according to the
Government, was paid approximately $1 million by Demane-Debih in exchange for inside
information.  While the Government stipulated to a sentence of 30-37 months for Cohen, and the
Probation Office recommended a sentence of 24 months, Judge Pauley, last year, sentenced
Cohen to one year of *home confinement*, 1,500 hours of community service, and a $25,000 fine.
Telemaque Lavidas, the son of a board member of Ariad Pharmaceuticals, Inc., forced the
Government to prove its allegations at a weeks-long trial, where he was ultimately convicted by
the jury of stealing Ariad's corporate secrets and passing them to securities traders.  Probation
recommended a sentence of 18 months, despite the Government's stipulation to a sentence of 63
to 78 months, based primarily on a net profit of $7.3 million.  The Government disagreed sharply
with Probation's recommendation and sought a sentence that was "substantially in excess of the
Probation Department's recommendation."  Judge Cote, however, sentenced Lavidas to *one year
and one day*.  Finally, John Dodelande, an art dealer with access to investment bankers at
Centerview Partners and Moelis, leaked information to Marc Demane-Debih about more than
fifteen M&A transactions in exchange for $12 million in cash.  Dodelande, however, received a
non-prosecution agreement, meaning that he will not face any period of incarceration
whatsoever.

       It is hard to credibly contend that Dov—a remote tippee—is any more culpable
than these individuals—some of whom breached fiduciary obligations that they knowingly
accepted.  Given Dov's eight months incarceration and more than five months of confinement in
a country not his own, it is difficult to understand why a sentence requiring further prison time

would be necessary.  Indeed, if the Court were to sentence Dov to additional prison time, the amount of time that Dov would remain incarcerated would not be limited to the length of that sentence.  As an Israeli citizen convicted of a crime in the United States, Dov will not be permitted to return to his family upon completion of any sentence with the Bureau of Prisons, but will instead be transferred to ICE, which is permitted to detain him indefinitely before removal proceedings are completed.  As the Probation Department has recognized, Dov is a man who accepts that he acted wrongfully.  He has admitted to his mistakes, has taken responsibility for them, and has faced punishment for those regrettable decisions.  It is hard to understand why additional time—beyond the many months Dov has already spent imprisoned—would be necessary to satisfy the demands of justice.

Because it is a man's whole life that matters at sentencing, we respectfully submit that—consistent with the recommendation of the Probation Department—when the Court weighs Dov's entire life, the sentences of comparable defendants, and the punishment Dov has already suffered, only a sentence of time-served would match the sentencing statutes' requirement that the Court impose a sentence that is sufficient, but no greater than is necessary to achieve the purposes of § 3553(a).  In this instance, a sentence of time served would fully satisfy both the objectives of sentencing and the call of justice.  For these reasons, and those that follow, we respectfully request that the Court impose a sentence of **time served.**

## DISCUSSION

I.      **THE PROBATION DEPARTMENT RECOMMENDED A SENTENCE OF TIME SERVED AND SUCH A SENTENCE WOULD BE APPROPRIATE FOR A MAN WHO HAS ALREADY BEEN SIGNIFICANTLY PUNISHED.**

Pursuant to a written plea agreement, the parties have stipulated to an offense level of 21.  Because Dov has no criminal history, an offense level of 21 results in a Guidelines range of 37 to 46 months.  (*Id.*).  The Probation Department has adopted the parties' stipulated

Guidelines range.  However, Probation recommends a significant variance downward from this Guidelines range.  (PSR, p. 27).  Specifically, Probation "recommend[s] that Your Honor impose a sentence of **time served** (approximately 247 days' imprisonment), a three-year term of supervised release with the special condition of 12 months' home confinement, [ ] 300 hours' community service[,] [and] a fine in the amount of $75,000."  (PSR, p. 29) (emphasis added). Probation has explained that "there are several factors that suggest to us that a Guidelines term of imprisonment may be greater than necessary," namely that "Malnik strikes us as an industrious, driven, and family-oriented individual," who has already "served about eight-months in a Swiss jail."  (PSR, p. 28).

II.     **A BALANCED CONSIDERATION OF ALL RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a) DEMONSTRATES THAT A SENTENCE OF TIME SERVED IS SUFFICIENT BUT NO GREATER THAN NECESSARY TO ACHIEVE THE GOALS OF SENTENCING.**

As has been said, "imposing a sentence on a fellow human being is a formidable responsibility." *Gupta*, 904 F. Supp. 2d at 350.  The responsibility carries with it the obligation to "consider every convicted person as an individual and every case as a unique study," and, for that reason, judges are given both flexibility and deference, so that they may freely exercise compassion in the face of the "human failings" that can, and do, lead good people temporarily astray. *Gall*, 552 U.S. at 52.

A.     **Dov Malnik's History And Character.**

Dov's kindness and empathy shine through the more than 100 letters of support from the people who know him best.  These letters are written not just by immediate family members and close friends and colleagues but also by former teammates, coaches, and co-workers.  The fact that so many people, from all walks of Dov's life, have come forward to support him in this process is a testament to Dov's character.  Nearly every one of the letters

references a particular act of service where Dov went out of his way to bring comfort or reassurance to a person who was struggling.  Although it would not be practical to recite every word of these letters in this memorandum, in short, they speak of a man who values the important things:  hard work, self-discipline, loyalty and, above all, family.

1.      **Dov's Upbringing, Education, And Athletic Achievement.**

Dov was born in Israel in 1978, the oldest of three boys.  (PSR ¶ 49).  Dov's grandparents are Holocaust survivors and their determination and courage have long served as the example that Dov strove to emulate in his own life.[2]  Dov's mother and father both served as engineers for the Israeli Air Force and the Department of Defense—a job that each held until their respective retirements.  (Ex. A-5; Ex. A-6; Ex. A-4; PSR, p. 28).  The three brothers "did not grow up in a privileged" household; they all shared a single bedroom in their parents' small apartment in Rishon Le-Zion, a suburb outside of Tel Aviv.  (Ex. A-5; Ex. A-6).  Dov's parents instilled in their children the values that were important to them: "family values, respect, helping others, perseverance and modesty."  ( Ex. A-3).  From a very young age, Dov understood the importance of family.  Because Dov's parents worked long hours and could not afford after-school childcare, it was Dov who took responsibility for caring for his two little brothers each day, until his parents returned home.  ( Ex. A-4).  To this day, Dov's brother Daniel remembers a young Dov preparing meals for the three brothers, while their parents worked.  Daniel acknowledges that Dov "was not the best cook," but recalls to this day how grateful he was, as a child, that he had an older brother that cared so carefully for him.  (Ex. A-5).

---

[2] Dov's paternal grandparents, Efraim and Chaya Malnik, were captured and imprisoned in 1941 in the Kovno Ghetto and were there until 1944 when they were transferred to the Dachau and Stutthof concentration camps until their release the following year.

Dov's love for, and service to, his family continues to this day.  As friends and family describe, Dov provides critical support to his elderly father, Yacov, whose health has deteriorated in recent years, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████); Ex. A-51 ("I have [ ] seen how Dov took care of his father in the past couple of years when his health deteriorated, and took care of all the medical consultations, treatments, and was really the support pillar during his father's battle."); Ex. A-93 ("████████████████████████████████████

████████████████████████.  In a conversation with him it turned out that he was there all the time, every morning and throughout the day.  You see that he did not just come as an obligation, he came to help as much as possible and to be the support that his father needs so much with ████████████████  As Dov explains in his letter to the Court, one of his deepest regrets, and a source of remorse that will plague him forever, is the fact that his actions have led to an even greater amount of stress for his father, who has simultaneously been

████████████████████████

In addition to learning the value of family, Dov also understood early in life that hard work matters.  In addition to his schoolwork and caring for his younger brothers, Dov was an avid swimmer who dreamed of one day competing in the Olympics.  As a teenager, he trained nine times a week, often starting as early as five o'clock in the morning, before school began. (Ex. A-3).  At 13 years old, Dov received an offer to train at the National Institute of Sports, an elite boarding school, where students were given access to "the best coaches, Olympic facilities, a nutritionist, fitness trainers and everything it takes to get to the Olympics."  (Ex. A-4)  Dov,

however, decided to forgo this once-in-a-lifetime opportunity because he did not want to abandon his family, given how much his parents relied on his help at home.

Although he remained at home, Dov continued to practice in the mornings before school and his discipline paid off:  Dov broke more than one hundred Israeli age group records and ultimately competed internationally for the State of Israel, representing the country in various European and World Championships across the globe.  In 1998, the University of Minnesota offered Dov the opportunity to come to the United States on a full swimming scholarship.  Dov led Minnesota to back-to-back BIG 10 championships and he was recognized three times as an NCAA Division I All-American and as an Academic All-American.  Dov also served as team captain for two seasons, an accomplishment that Dov's former coach, Kelly Kremer, describes as "unique and reserved for [those athletes who] model[] the right behavior and demonstrate[] outstanding leadership qualities."  (Ex. A-14).  In Coach Kremer's 24 years coaching at Minnesota, there have been fewer than five people who have been named captain for more than one season.

Despite the fact that more than twenty years have passed, multiple teammates have written to the Court, to explain that the Dov was someone who led by example both inside the pool, through his hard work and dedication to his sport, as well as outside of the pool, in his willingness to always lend a hand or an ear to a teammate in distress.  (See e.g., Ex. A-24;  Ex. A-49;  Ex. A-60).  By way of example, Michael (Miki) Halika, a fellow swimmer and accomplished athlete, who represented Israel in the 2000 Olympic Games in Sydney, recalls how Dov unfailingly supported him during one of the darkest periods in his life.  Mike found himself with nowhere to go, after a devastating breakup with the woman he had planned to marry.  It was Dov who "put [him] up in his apartment . . .for many months," and who supported him through

9

emotional loss that was bigger than any he had suffered to date.  Ultimately, it was Dov who encouraged Miki to ask out the "young woman who [would] later become [Miki's] wife" and with whom he now has two beautiful children.  Miki writes that he will be "forever grateful" to Dov for the kindness and compassion shown to him.  (Ex. A-13).  Indeed, as close friend Ron Rabinowitz writes, "Dov has a rare combination of intelligence, motivation and leadership, which inspire people to achieve, excel and overcome obstacles," and that sentiment is echoed over and over again in the letters penned by Dov's friends and family.  (*See, e.g.,* Ex. A-7).

In 2002, Dov graduated from Minnesota's Carlson School of Management with a bachelors' degree and a GPA of 3.352.  (PSR ¶ 67).  After graduation, Dov passed up promising career opportunities in the United States in order to return home to Israel and serve his country, both as a solider and an athlete.  (PSR, p. 28).  Having seen both of his parents serve the Israeli military as engineers, Dov considered the opportunity to complete his Army service to be both an honor and a privilege.  Although Dov, as an elite athlete for Israel's national team, was "not obligated to do a meaningful military service," it was important to Dov that he serve his country through military service, even though it meant that he was forced to do his athletic training in the very early mornings and the late evenings.  (Ex. A-41.).  Dov became a Staff Sergeant in a paratrooper brigade of the Israeli Defense Forces and simultaneously trained day and night to try to qualify for the 2004 Olympic Games in Athens.  During this period, Dov would wake up to swim over five miles in the morning, before driving to the military base to serve a full day, and then returning to his training facility where he would lift weights and swim again.  (Ex. A-8).  In 2003, Dov broke the Israeli national record in the 200-meter breaststroke and represented Israel in the World Championships.  Unfortunately, just one month before qualifications for the 2004

Olympics in Athens, Dov broke his arm in a training accident.  The injury effectively ended his swimming career and his Olympic dream.

        2.      **Dov Begins His Career, Moves To Switzerland, Meets His Wife, And Starts A Family.**

Although Dov's injury put an end to his athletic aspirations, Dov hoped that the discipline he had learned in athletics could nevertheless assist him in building a career.  At 27 years old, Dov began his first professional job: working in the back office of an Israeli bank on a salary of approximately $1,000 a month.  The bank recognized Dov's potential, and within a few months he was promoted.  Shortly thereafter, Dov made a lateral move to the Tel Aviv branch of an American investment bank, CIBC World Markets, where he worked as a trader.  In 2006, Dov received a job offer to work at a Swiss bank in Geneva named UBP and he jumped at the opportunity, although it required him to move to Switzerland.  There, as in each of his prior positons, Dov's colleagues observed him to be "an honest and upstanding employee," "respected for his integrity."  (Ex. A-58.;  Ex. A-72;  Ex. A-76.;  Ex. A-104;  Ex. A-80; *see also* Ex. C).

Shortly after moving to Switzerland, Dov met his wife, Celine, and the two, both of whom came from similar family backgrounds, fell in love and were married.  In 2016, Dov and Celine had their first child, ██████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████



Dov's absence from his son's life during the past year has been extraordinarily difficult on the young boy.  (*See, e.g.,* Ex. A-3;  Ex. A-56;  Ex. A-34.;  Ex. A-40;  Ex. A-42).  Celine describes the pain her son has experienced over the past thirteen months:





In 2019, Celine gave birth to beautiful baby girl, ▮▮▮. Like so many fathers, Dov was instantly smitten with his baby daughter. Friends have described ▮▮▮ birth was a sort of "redemption" for Dov, after the hardship and difficulties the family had suffered in connection with ▮▮▮ birth. Prior to being arrested, Dov was an extraordinarily hands-on dad with baby ▮▮▮: friends recall that in "every opportunity he had, [Dov] would take [▮▮] on the stroller for hours and hours of walking, just enjoying being with her. He took her to the swimming pool, to the playgrounds and she always loved to be in her father's arm, never wanted to let go." (Ex. A-12; *see also* Ex. A-25). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮

▮▮▮ is a source of tremendous grief for Dov.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮. (Ex. A-22; Ex. A-2; Ex. A-44; Ex. A-25; Ex. A-7). In short, Dov is "very much a family man." (Ex. A-50). Since the birth of his children, he has been an "exemplary father," who always thinks first and foremost of the welfare of the children and the family. (Ex. A-21; Ex. A-19.; Ex. A-32). Indeed, in recommending a sentence of time served, Probation took special note of the fact that Dov, "by all accounts, is an excellent husband and father." (PSR, at p. 28).

3.    **Dov's Character.**

As the testimonies in the enclosed letters of support demonstrate, the improper conduct that Dov engaged in, and for which he has accepted complete responsibility, constitute aberrations in a life where he has long been known as a kind-hearted, hard-working and humble man. (*See, e.g.* Ex. A-62 ("It was a big shock for us to learn that Dov was arrested and faced a charges on financial crime. Dov was always an honest guy, a man of high values, and I can't understand how he found himself in this situation."); Ex. A-61 ("All of us here in Israel were very surprised to hear about the incident for which Dov was arrested in Switzerland. It does not fit the character we know and love."); Ex. A-11 (Dov's actions are "not a representative of who he is and how he led his life"); Ex. A-34 (same)). Although Dov's arrest was shocking and disappointing, Dov's friends and family firmly believe that his actions were a mistake, a deeply regrettable lack of judgment in an otherwise upstanding life. Dov's friend, Kathy Gladkikh, put it well: "Dov is the kind of person you would want to get stuck with on a lonely island; an interesting person, smart, funny and kind-hearted. Someone you know will have your back and take care of things." (Ex. A-18). It is this big-heartedness that have inspired so many people to write so earnestly to the Court, on Dov's behalf, in the hopes of showing Your Honor what kind of person Dov really is:

- Dov's Rabbi, Eliahu Birnbaum, has written to the Court to explain that "beyond his care and dedication to his family, Dov is a good friend to many, looking out for them, and always ready to assist in any way he can, providing them with everything they may need, be it physical or emotional support. I have seen firsthand his kind-hearted nature in action, supporting individuals, families and institutions that needed external help. Whatever he gives, he always does so wholeheartedly, gladly and with a ready smile, providing not only much needed assistance, but more importantly, a sense that the other is the most important thing in Dov's life at the moment." (Ex. A-32).

- Dov's close friend Erez Rosen, ████████████████████████████, similarly describes how Dov is there for him: "████████████████████████████████ ████████████████████████████████████████████ ██████████████████ . . . I am surrounded by love from family and friends but the

14

calls from Dov are different.  He doesn't just call to hear how I feel but spends hours with me on the phone discussing anything to distract my thoughts.  For me it is very meaningful."  (Ex. A-9).



- Omer Izhaki, a fellow competitive athlete, who, like Dov, had his Olympic dream crushed by a devastating injury, describes how he fell into a dark place and that it was Dov who gave him a place to stay, "saved [him] from living in the streets," and gave him the opportunity to "rehabilitate from [his] injury to continue to pursue [his] Olympic dream."  (Ex. A-36).



- Shahar Sheinfeld, one of Dov's childhood friends, says that Dov helped him get through some of the most difficult times in his life and that he does not know what he would have done without Dov. ███████████████████████████████████ ███████████████████████████ Although Dov was living abroad at the time, Shahar reached out to Dov, who stayed with him on the phone the entire time and let him know that he was not alone.  Thereafter, Dov "dropped everything" and travelled to Israel to be there for Shahar during his grieving process.  (Ex. A-10).

- Shilo Ayalon says that Dov is a "true friend who was there for me through thick and thin."  Shilo is a fellow Israeli swimmer a few years behind Dov who also came to the U.S. on scholarship to compete for Georgia Tech and receive his education.  Shilo explains that when he decided, like Dov, to return to Israel after college to serve his country in the military, he struggled with the transition.  Going from having the freedom of a college student to a "soldier with a fixed daily routine, and non-existent income" led Shilo to be "lost and depressed." Shilo explains that during this time, "Dov was there for me.  He offered to let me stay in his place until I figured things

out.  No timeline, no due date, no pressure - despite it being a cramped Tel Aviv apartment occupied by Dov and his girlfriend, their roommate and his significant other.  Dov got me a mattress to sleep on, and I stayed there for close to a year.  He re-introduced me to enjoying the company of friends and helped me ease back into my new reality.  I recall that often Dov would return from work close to midnight, see that I wasn't having a great day and proceed to rush me out to grab a bite or a drink and take my mind off my trouble." (Ex. A-8).

- Alon Halfon recounts how Dov was there for him during his ██████████████ ██████  "Throughout these difficult years I have experienced, Dov was one of the few that were beside me, supporting me mentally, calming me with advise (sic) and reassurance. There were even times when I had no where to go to and luckily I had Dov, to organize for me a place to stay, even if he was not himself in Geneva at that period.  For someone as busy as Dov, to always be able to listen to my problems, giving advice, with the utmost attention, is not trivial thing. This support I will never forget."  Indeed, incredible as it seems, Alon's correspondence with Dov, who was imprisoned in Champ-Dollan during much of their communication, offered such reassurance that Alon freely admits that during "the most difficult year [of] my life, the single most meaningful person in helping me was Dov, even while he was incarcerated in prison."  (Ex. A-11).

- Mario Ariazzi, one of Dov's cellmates in the Swiss prison where he was held, explains how "When I first arrived in Dov's cell with nothing on me, and having no family to help me from the outside, Dov immediately gave me food items, snacks, canned tuna, quick soup boxes.  He also gave me a thermos to have hot water which he purchased in the prison store and a diskman.  When he realized that I have no money to buy anything, he transferred me 50 chf which is the maximum allowed between inmates.  He also helped me with daily tasks which I need help due to my medical condition, always willing and caring."  (Ex. A-102.).

- Dov's friend Einat Kandal describes that when she was mourning her mother's death, "Dov was there as a true friend and supported me and my family throughout the period, did not let me sink, always suggested we meet and spend time together, so I would not cope alone."  (Ex. A-19).

As reflected in these countless acts of kindness, Dov never expected anything in return for his help.  Dov's friend Ron Rabinowitz summarizes it well.  Ron recounts that when Dov received the tragic news that a █████████████████████████ and learned that the family had launched a website to collect donations to fund an urgent treatment that was required, Dov "immediately donated a very generous amount."  Ron remarks that "the amazing thing [was] not the donation itself, but the fact that Dov donated such an amount to a

relatively remote person, in a heartbeat, and most impressively: without asking for any credit in return, i.e. anonymously.  Nothing can be more telling of a person's true character than a noble contribution which is provided anonymously, with nothing in return, not even a public or private recognition.  Well, for Dov, this is not an exception, but rather – a norm."  (Ex. A-7; *see also* Ex. A-20).  Ron says that in the entire thirteen-years he has known Dov, he "cannot recall a single case where [Dov] declined a request for help, no matter from whom."  (Ex. A-7; *see also* Ex. A-27 ("Dov will never say no to anyone seeking help, whether it is friends who are close to him or people he barely even knows.")).  We submit that these testimonials, describing a man who has consistently, for decades, taken the time to be there in ways large and small for those he loves, merit consideration in any fair and just sentence.

### 4.     Dov's Arrest And The Harsh Conditions of Dov's Incarceration

On October 7, 2020, Dov was arrested in Switzerland by Swiss authorities acting pursuant to an extradition request from the United States.  (PSR, p. 1).  For more than eight months, from October 7, 2020 until June 9, 2021, Dov was detained at Champ-Dollon prison in Switzerland.  Champ-Dollon is the largest maximum security facility in Switzerland and houses primarily non-Swiss citizens accused of violent crimes.  The facility has long been notorious for its deplorable conditions.

Indeed, in their many letters of support, Dov's friends and family explain just how harsh the conditions were at Champ-Dollon.  Dov's sister-in-law, Dr. Isabelle Engeli (who is a Professor of Public Policy and the Head of the Politics Department at the University of Exeter), accurately describes the history of the facility:

> The prison where Dov was incarcerated for eight months suffers from chronic overpopulation.  The pre-trial prison facility has barely been upgraded since the inception of the prison at the end of the 1970s, while the inmate population has steadily increased.  The chronic overpopulation and its consequences for the inmates and the

17

> prison officers has regularly hit the news in Geneva but sufficient
> budget increases have not followed.  The substandard conditions at
> this prison (for being incarcerated and for working there) have been
> regularly highlighted by the prison officers' union . . .  the Swiss
> National Commission for the Prevention of Torture . . .  as well as
> by NGOs and community associations.  Doctors from the Geneva
> University Hospital have demonstrated that the overcrowding in
> Geneva prison facilities (which peaked as high as 200% [capacity]
> a few years ago) has led to a significant increase in self-harm and
> self-strangulations.

(Ex. A-21).  In fact, the Swiss Supreme Court has ruled, several times, including as recently as

May 2020, that the conditions of detention at Champ-Dollon violate European Convention on

Human Rights.  (Ex. A-26; Ex. D; Ex. E).

These conditions were only exacerbated by the COVID-19 pandemic.  As a result

of the pandemic, inmates were placed in complete isolation for ten straight days after arriving at

the facility.  After quarantine, inmates were placed in a cell with anywhere from one to three

other cellmates.  Inmates spent **23 hours a day** in their cell and were not permitted to do any

activites outside their cell.  Most occupational workshops were suspended.  Access to the gym

and other opportunities for exercise were drastically restricted.  Perhaps most importantly,

inmates were completely shut out from the outside world.  Inmates did not have access to email

and—because there were only three phones available for a population of over 600 inmates—

inmates were permitted **one fifteen-minute phone call every two weeks**.  Indeed, upon arrival

at the facility, inmates had to wait, on average, **six weeks for their first phone call.**

This recitation of conditions is not simply Dov's *perception* of his experiences at

Champ-Dollon; these are documented facts, observed by the Swiss Government, which, in

December 2020, sent a commission to assess the measures put in place at the prison in response

to COVID-19 and the consequences of those measures on the rights of inmates and their

conditions of detention.  The report ultimately authored by the Swiss Government describes the

incredibly difficult conditions.  (Ex. F (Swiss National Commission for the Prevention of

Torture, reporting that "new inmates" were not permitted to "leave their cell" for "ten days,"

that established inmates were "locked up in cells 23 hours out of 24 hours," that the majority of

occupational workshops were suspended, and that only three telephones were available to the

602 inmates at the facility and "detainees ha[d] to wait an average of six weeks to make their

first phone call to their loved ones")).  The Swiss Government also learned that in November

2020, approximately 150 inmates were placed into an additional period of quarantine, where they

were not permitted to leave their cells, or communicate with anyone other than their cellmate for

an additional 10 days.  (*Id.*).  An official study done by the prison's medical unit found

"significant increases in suicide attempts and self-harm events during the pandemic period" at

Champ-Dollon.  (Ex. G, Laurent G´etaz et. al, Suicide Attempts and Covid-19 In Prison:

Empirical Findings From 2016 to 2020 in a Swiss prison, PSYCHIATRY RESEARCH (Jul. 5, 2021)).

This was Dov's reality for more than eight months.  Dov arrived at Champ-Dollon

on October 7, 2020.  Upon arrival, Dov was placed into what was essentially solitary

confinement for 12 days to quarantine.  Even after the quarantine period concluded, Dov spent

**23 hours a day** in his cell with one cellmate—a man convicted of murder.  In November 2020,

Dov was one of the inmates referred to in the Swiss report, who was placed into an additional

period of isolation for 10 days, where he was not permitted to leave his cell or communicate with

anyone.

Dov was not able to make his first phone call to his wife and children until

December 1, 2020, more than seven weeks after he arrived.  (Ex. H).  His primary means of

communication with family and friends was by physical mail, which often took weeks to reach

Dov's loved ones in Israel.  Face-to-face contact with his family was virtually nonexistent.

While Champ-Dollon ordinarily had "Family Wednesdays," where once a week, the families of inmates were permitted to gather in a family-friendly environment that allowed for physical contact—for example, for a father to hold his children—those too were abolished due to COVID for the entire period Dov was at Champ Dollon.

On December 10, 2020, Dov's wife Celine (and her attorney) wrote a heartfelt letter to Swiss authorities **pleading** for an exception so that their family could see one another, by whatever means necessary, such as gathering in one of the rooms at Champ-Dollon designated for attorney visits.  (Ex. I; Ex. J).  Celine explained that because her children were not old enough to read or communicate effectively over the phone, it was critically important that they be able to see their father in person:  "My 4 year old son doesn't understand why he can't see his father.  He looks at the letters his father writes but can't read the words.  My 16 month old daughter does not talk on the phone. . . . I see my children's grief at the loss of the bond with their father and I feel helpless."  (Ex. I).  Celine's requests, however, were each denied.  (Ex. K, Letter from Champ Dollon).

All told, Dov was only able to see his daughter ███ one time, during the entire eight months he was imprisoned at Champ-Dollon.  The first time he saw his son ███ was January 26, 2021, almost four months after his arrest.  During each of these visits, he could only see his children through a Plexiglas window and was forced to speak to them through a prison phone.

Finding it impossible to reach his children via letters and over the phone, Dov found the one way to communicate with them which they might understand: drawings.  As Celine's sister recounts:

> Dov found an amazingly touching way for communicating with his kids through drawing.  They are too small to read or even to have a

sustained conversation over the phone or in a prison visit.  Dov
learned how to draw from scratch while in prison and became very
talented at drawing all sorts of dinosaurs (█████ favorites) and
Disney's characters among others.  He sent a drawing almost every
day and the kids loved it.  We all loved it.  The drawings were a little
bright light in the dark days of the severe duress.

( Ex. A-21; *see also* Ex. A-23 ("Celine tried to maintain . . . the father-children bond with the help

of the only available correspondence adapted to the age of their children: the drawings.  And so,

little by little, the walls of the rooms in their home were covered with messages of love.")).  Dov's

friend Einat Kendall explains just how much this meant to █████ :

When I came to his house during the time he was in prison I saw
children's paintings hanging on the wall in the living room and I
asked █████ who painted them.  He proudly told me 'my father!'.
Every time I would walk into their house during this time and look
at this emotional wall (and try to hold my tears) I would think how
lucky his kids are to have such an amazing dad trying to have his
kids remember him and be present in their lives despite the distance.
Every time I would come, █████ would show me another new
drawing and I would see how he looked at the drawings and clung
to the shred of dad he could still feel through them.

( Ex. A-19);  Ex. A-102 (fellow inmate describing how he "watched [Dov] every evening

making paintings for [his children with] tears in his eyes"); *see also* Ex. L (compilation of

drawings).  █████ , denied his father's physical presence and even the sound of his father's voice,

would faithfully clip his favorite of the drawings to the wall above his bed, so that he could have these messages from his dad overlooking him as he fell asleep each night:



In an effort to remain close with his children, despite all the obstacles, Dov wrote ███ and ███ a storybook, accompanied by hand-drawn illustrations.  (Ex. M, Children's Book).  As Dov's wife Celine describes, the "bedtime book" featured the "kids' favourite Disney character - Mickey Mouse."  Dov "created a cartoon story with drawings of Mickey Mouse," who had been "sent by Daddy to help [███ and ███] stay happy. Mickey plays with the [children], takes them on a trip in his car, ha[s] dinner together and teaches them to smile even if sometimes they are sad."  After the homemade book arrived in the mail, "every evening ███ would say 'mommy can you read me Aba's (Daddy's) book? He sent Mickey to play with me!'" and ███ would sometimes wake up to tell Celine that when he slept, "he dreams that when he wakes up, maybe Dov will be back."  (Ex. A-2).

5.     **Dov's Home Confinement In The United States.**

Once Dov arrived in the United States, he was granted a bail condition of home confinement.  Dov's "home" confinement, however, has been quite unlike that of other defendants sentenced by this Court in that it was not served at "home."  Rather, Dov has spent the last five months here in New York, in a rented apartment, where he has mostly been alone, far from Celine and the children, who must remain in Geneva where they have school and work. Dov was given a fleeting reprieve from his separation from his family, when Celine, ███, and ███ were able to travel to New York City for a few weeks during summer break.  As Celine recounts: "finally after so long, we came in July to New York and for the first time in 9 months, I hugged Dov, ███ got the 'bear hug' he always loved and ███… well she discovered finally that she has a father.  She was finally able to experience what having a dad really means.  We were so happy together but the truth is that it was hard to enjoy when every joyful moment is followed by the creeping fear of what will happen if Dov is taken from us again."  (Ex. A-2;  Ex. A-1).

Unfortunately, after only about five weeks together, Dov's wife Celine (who is a teacher) and the children had to return to Geneva for the beginning of the school year.  (Ex. A-2). While Dov continues to videoconference with his children several times a day, the fear of losing Dov to an additional period of incarceration is one that looms over the family.  (Ex. A-1 ("█████ constantly asks Celine to do video chat with me, he puts the phone in his pocket and "carries" me around while he plays in the house, eat dinner, just so we are 'together'.  He sometimes puts the phone on the kid's slide in our garden and tell me 'Aba, do you want to slide fast or slow?' just before he lets go of the phone and slides it down… and again and again.  I am happy that I am able to give him this feeling even in this strange way, but I am just praying for this nightmare to be over so I can actually be there next to him."); Ex. A-2 ("[N]ow the kids call Dov 8 times a day, asking me to make a video call to show him everything they do.  'Aba look how I ride my bicycle' ████ says, and ████ tries to show him how she jumps on the sofa.  They are constantly making sure he is still there, asking him where he is, what he is doing, inspecting for signs of a new disappearance. ██████████████████████████████████████.  I am so scared of what will happen if Dov is incarcerated again, 4,000 miles away, and the kids would lose again even this reassurance.  This repeated break would have devastating effect on our young kids[.]")).

**B.**      **Any Additional Period Of Incarceration Will Impose Substantial Burden On Dov's Wife And Young Children.**

The Second Circuit has long recognized that courts should consider the burden a sentence will impose on innocent family members when fashioning an appropriate sentence. *See, e.g., United States* v. *Isola,* 548 F. App'x 723, 725 (2d Cir. 2013) (identifying "[defendant's] family circumstances and the effects of his incarceration on his daughter" as one of the factors to be considered under 18 U.S.C. § 3553(a)); *United States* v. *Bills,* 401 F. App'x 622, 624 (2d Cir.

24

2010) (holding that "the likely effects of [defendant's] incarceration on her daughter" were one of the "mitigating factors" that was appropriately considered under 18 U.S.C. § 3553(a)); *see also United States* v. *Johnson,* 964 F.2d 124, 128 (2d Cir. 1992).

    For example, in *United States* v. *Blaszczak,* Judge Kaplan recently imposed a sentence well below the Guidelines range on an insider trading defendant who was convicted after trial, because of the burden that lengthy incarceration would impose on his wife and child. Specifically, defendant David Blaszczak was convicted of engaging in a six year scheme to sell inside information to hedge fund clients that used that information to realize over $7 million in gains. (Ex. N at 2-3). Blaszczak was paid more than $700,000 for the inside information. *Id.* at 9. Judge Kaplan concluded that Blaszczak had "aggressively" pursued sources of inside information that he could sell and that he was "bold, unapologetic, and giddy about what he was doing." (Ex. O at 62:15-24). Under the Sentencing Guidelines, Judge Kaplan calculated an offense level of 26, resulting in a sentencing range of 63- 78 months. *Id* at 22:19-23: 1. Yet, Judge Kaplan sentenced Blaszczak to only 12 months and one day in jail, plus two years of supervised release. *Id.* at 72:6-13. The reason for this substantial deviation from the Guidelines was that Blaszczak's wife, who had a degenerative eye disease, and his child, would be severely burdened by his absence. Judge Kaplan stated: "[t]he wreckage that a long period of incarceration would wreak on her and on your son is horrifying to me. And the sentence I am going to impose on you is going to reflect that." *Id.* at 70: 19-22.

    Similarly, in *United States v. Chow*, 17-cr-667, Dkt. 161 (S.D.N.Y. Jan. 17, 2019), Judge Woods explained that family circumstances merited a sentence of only three months' imprisonment, even though the Guidelines range was 63-78 months and the defendant had proceeded to trial rather than pleading guilty: "Dr. Chow is a father with a family with

young children, he has elderly parents who he supports. . . . Here, Dr. Chow's commitment to, in particular his parents given their deteriorating health, I think is a significant factor that weighs in favor of a downward variance."  (Ex. P, Chow Sentencing Tr. at 82:24-83:6).

In Dov's case, an additional period of incarceration beyond the time he has already served will impose a significant burden on his family. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████ :

████████████████████████████████████████████
████████████████████████████████████████████





We submit that, consistent with the recommendation of the Probation Department, a sentence of time served (over eight-months of incarceration during a pandemic, followed by more than five-months of home confinement in a foreign country) would mitigate the burden on Dov's family while satisfying the requirements of Section 3553(a).

**C.**    **<u>A Sentence of Time Served Is Appropriate in Order To Avoid Unwarranted Disparities With Comparable Cases</u>.**

1.    **Dov Has Already Been Punished More Severely Than Other Members Of The Same Alleged Insider Trading Scheme.**

In determining the appropriate sentence for Dov, this Court must also consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Avoiding such disparities is a key aspect of this Court's duty to "impose a sentence sufficient, but not greater than necessary to comply" with the purposes outlined in Section 3553(a). *See United States v. Brennan*, 395 F.3d 59, 69 (2d Cir. 2005); *United States v. Dorvee*, 616 F.3d 174, 182-83 (2d Cir. 2010). In Dov's case, this factor supports a sentence of time served. In fact, there are numerous individuals who participated *in the same alleged insider trading scheme*, and who have received little or no jail time. Even though there is no credible argument that Dov—a remote tippee—is more culpable than these individuals, Dov has already been punished more severely than they have been.

For example, Bryan Cohen, a former investment banker at Goldman Sachs, pled guilty to conspiracy to commit securities fraud for betraying his employer and his corporate clients by repeatedly stealing confidential business information that had been entrusted to him, and providing that material non-public information to Marc Demane-Debih, who made profitable trades and further passed that information on to an individual named George Nikas. *See* Ex. Q, *United States v. Cohen*, 19-cr-741, Government Sentencing Submission [Dkt. No. 44] (May 27, 2020) at 2. The Government argued that Cohen's conduct "can only be described as brazen," in part because Cohen allegedly communicated with burner phones and spoke in code. *Id.* at 11. Cohen was paid approximately $1 million in cash for those tips and Cohen's tips resulted in approximately $9 million in gains for Nikas and Demane-Debih. *Id.* at 4. Since most of the trading resulting from those tips occurred in Europe, the Government agreed to a stipulated Sentencing Guidelines range of 30-37 months' imprisonment for the trading in the United States,

but requested a sentence at the top of that range.  *Id.* at 9.  The Probation Department

recommended a sentence of 24 months' imprisonment.  *Id.*  Judge Pauley, however, considered

the conduct and sentenced Cohen to twelve months of *home confinement*, 1,500 hours of

community service, and a $25,000 fine.  (Ex. R, *United States v. Cohen*, 19-cr-741 (S.D.N.Y.),

[Dkt. 48] Sent. Tr. at 44-45 (Jun. 9, 2020)).[3]  In other words, Cohen did not receive *any* custodial

sentence.

        Telemaque Lavidas was convicted—at trial—for misappropriating corporate

secrets of Ariad Pharmaceuticals, Inc., which he passed to various traders over multiple years.

(*See* Ex. S, *United States v. Lavidas*, 19-cr-716, Government Sentencing Submission at 2-3 [Dkt.

No. 115] (June 16, 2020)).  The Government agreed to a stipulated Guidelines range of 63-78

months of imprisonment based on a cognizable gain of $7.3 million.  *Id.* at 4.   After Probation

recommended a sentence of 18 months, the Government sought a sentence that was "below the

applicable Guidelines range of 63 to 78 months, but that [was] substantially in excess of the

Probation Department's recommendation of 18 months."  *Id.*  Judge Cote, however, sentenced

Lavidas to *a year and a day*.  (Ex. T, *United States v. Lavidas*, 19-cr-716 (S.D.N.Y.) (Cote, D.),

[Dkt. 127] Sent. Tr. at 59-60 (Jul. 30, 2020)).

        Finally, John Dodelande received a non-prosecution agreement.  Dodelande was

an art dealer with access to investment bankers at Centerview Partners and Moelis, both of which

---

[3] In rendering Cohen's sentence, Judge Pauley noted the harsh conditions that foreign nationals like Cohen—and Dov—face in U.S. prisons.  *Id.* at 42:4-12 ("In dealing with defendants who are foreign nationals like Mr. Cohen other judges have given consideration to the consequences attached to that status by the Bureau of Prisons.  Foreign nationals, unlike similarly situated US citizens, are unable to serve terms of imprisonment in a camp or minimum security facility.  And when foreign nationals complete a term of imprisonment they are transferred to ICE detention where they can wait for an indefinite period to be returned to their home country.").

worked on merger and acquisition transactions for publicly traded companies.  (Ex. U, *United States v. Lavidas*, 19-cr-716 (S.D.N.Y.), Trial Tr. at 354:24-355:18).  Over many years, Dodelande leaked information to Demane-Debih about more than 15 M&A transactions from which Demane-Debih earned many tens of millions of dollars in illegal profits.  Dodelande was paid more than $12 million in cash for these tips.  (*Id.* at 363:14-19).  Notwithstanding these facts, the Government gave Dodelande a non-prosecution agreement, meaning that he will not face any punishment whatsoever.

Dov has *already* served more than eight-months of imprisonment in harsh conditions at the peak of this unprecedented pandemic, plus an additional five-months of home confinement in a foreign country thousands of miles away from his loved ones.  This is far more severe than the punishments incurred by Dodelande, Lavidas, and Cohen, who engaged in conduct just as culpable—if not meaningfully more culpable than Dov.  We submit that the sentences imposed on these individuals should be considered in fashioning a just sentence for Dov.

2.      **Many Other Recent Insider Trading Sentences In This District Have Been Substantially Below Guidelines.**

The recent trend in sentencing insider trading defendants is to impose sentences substantially below the Guidelines.  From 2019-2020, 44 out of 45 insider trading defendants sentenced under U.S.S.G. § 2B1.4 received below guidelines sentences.  *See* 2019 Annual Report and Sourcebook of Federal Sentencing Statistics; 2020 Annual Report and Sourcebook of Federal Sentencing Statistics.  This is particularly true in cases like this, where the defendant is merely a tippee and thus, not the person who violated a fiduciary duty to keep certain information confidential.  In addition to the related cases above, the following cases in this District demonstrate that a sentence well below Guidelines is just and appropriate.

- Cameron Collins – *United States v. Cameron Collins*, 18-cr-567 (S.D.N.Y.)

Collins's father sat on the board of a pharmaceutical company and shared with his son

material non-public information about the company he learned through his role on the board.

(Ex. V at 1).  When Collins's father tipped to Collins information that the company's only viable

drug had failed its clinical trial, Collins, along with family and friends who had also invested in

the company, all sold their shares in advance of the public announcement of the failed drug trial.

*Id.* at 2.  Collins realized approximately $571,000 in avoided losses, and his family and friends

realized a combined additional $186,000 in avoided losses.  *Id.* at 3.  When initially questioned

by the FBI, Collins lied to law enforcement regarding the evidence that he had committed insider

trading, denying that his father had provided had provided news of the failed drug trial in

advance of the public announcement.  *Id.*  Collins eventually pled guilty prior to trial.  *Id.* at 1.

Collins's presentence investigation report, prepared by the United States Probation

Office, as well as the Guidelines, provided for an applicable range of 37 to 46 months'

incarceration—the same as Dov.  *Id.*  On January 23, 2020, Judge Broderick imposed a sentence

of five years' probation, with no imprisonment whatsoever.  (Ex. WW at 2).

- Robert Stewart and Richard Cunniffe, *United States v. Robert Stewart* and *United States v. Richard Cunniffe*, 15-cr-287 (S.D.N.Y.)

Stewart received material non-public information from his son, an investment banker.

(Ex. X at 2).  Stewart traded upon this information for over four years, realizing profits of

approximately $1.16 million.  *Id.* at 1.  At one point during the scheme, Stewart was approached

by law enforcement regarding the timeliness of his trading, at which point Stewart approached

his friend, Cunniffe, with the information and thereafter Cunniffe conducted the trading on his

behalf.  *Id.* at 2-3.  The Government relied on evidence that Stewart had Cunniffe trade on his

behalf to avoid detection, and that Stewart and Cunniffe would communicate in code regarding

their trading to mask their crimes. *Id.* at 4. As to Stewart, the applicable Guidelines range for imprisonment was between 30 and 37 months, and the Probation Office recommended a sentence within that range. *Id.* at 5. Judge Swain sentenced Stewart to four years of probation, and no imprisonment. (Ex. Y at 2). Cunniffe was sentenced to 1 year of probation. (Ex. Z)

- Jeffrey Rogiers & Jhonatan Zoquier, *United States v. Rogiers* and *United States v Zoquier*, 1:17-cr-503-AJN (S.D.N.Y.)

Both Rogiers and Zoquier were two of seven defendants charged for their involvement in a series of three insider trading schemes based on information being supplied by a Bank of America employee. (Ex. AA at 1). On more than fifty occasions, and for approximately three years, the employee would provide material nonpublic information to numerous tippees, resulting in the scheme earning more than five million dollars in illicit profits. *Id.* at 2. Two of these tippees were Zoquier, a close friend of the employee, and Zoquier's close friend Rogiers who personally earned fifty thousand and thirty thousand in illicit profits, respectively. *Id.* at 3-4. Additionally, Rogiers had passed inside information along to at least three other individuals, for total additional gain in excess of $400,000. *Id.* at 5. The Guidelines provided for a term of imprisonment between 18 and 24 months for Rogiers, *id.* at 7, while the applicable range for Zoquier was between 12 and 18 months, Ex. BB (Zoquier Government Submission) at 1. Rogiers and Zoquier engaged in conduct similar to Mr. Malnik as tippees in a larger insider trading scheme—and Rogiers engaged in even more culpable behavior by tipping the information to additional third parties—and both received sentences significantly below the Guidelines, each being sentenced to only three months incarceration. (Ex CC at 2, Ex. DD at 2).

When fashioning an appropriate sentence for Dov, we submit that the Court should consider, pursuant to Section 3553(a)(6), the sentences received by similarly situated defendants in this District. Considering that Dov has already served over eight-months of

incarceration under harsh conductions, plus an additional five-months of home confinement in a foreign country away from his family as a result of his conduct, these cases further support a sentence of time served in this case, as recommended by the Probation Department.

3.     **The Danger Of Sentencing Disparity Is Greatly Enhanced By Virtue Of Dov's Non-Citizen Status.**

The need to avoid unwarranted sentencing disparities among defendants with "similar records" who have been found guilty of "similar conduct" is particularly acute here given Dov's non-citizen status.

If Dov were a U.S. citizen sentenced to a period of incarceration, as a non-violent first-time offender, he would be assigned to a prison camp—the least restrictive "minimum-security" facility within the BOP.  However, given his non-citizen status, Dov will be classified by the BOP as a "Deportable Alien" and will be designated to at least a "low-security" facility (or some other higher-security facility).  The environment at a low security facility is significantly harsher and more difficult than that of a camp.  This difference has a stark impact, from restrictions on inmates, quality of life due to crowding and the scope of visitation rights, and perhaps most importantly, the danger posed by other inmates.[4]

Moreover, in January 2018, the Trump Administration required that the BOP re-designate all low-security male, non-U.S. citizen inmates with 90 months or less remaining in their sentence for transfer to a contract, for-profit prison.  (*See* Ex. EE, Bureau of Prisons Memorandum for Chief Executive Officers, Increasing Population Levels in Private Contract Facilities (Jan. 24, 2018)).  As the 2016 Office of the Inspector General ("OIG") "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" found, for-profit prisons are

---

[4] This limitation also rules out designation to facilities with active Jewish populations and full religious availabilities such as the FCI prison camp at Otisville.

significantly more abusive, violent and dangerous than those run by the BOP.  (*See* Ex. FF).  One

of the conclusions of the report stated that "contract prisons incurred more safety and security

incidents per capita than comparable BOP institutions."  (*Id.*).  These for-profit facilities have a

history of failing to provide adequate medical care to the inmates entrusted to their supervision.

In fact, the report makes the troubling finding that these facilities were medically understaffed

and "raised concerns that *medical understaffing on the part of the contractor was financially*

*incentivized because it costs the contractor less to pay penalty deductions for understaffing than*

*to staff the prison adequately*."  (*Id.*) (emphasis added).[5]  Such living conditions would be made

worse by the fact that Dov's two young children, ███ and ███, his wife Celine, as well as his

parents, live thousands of miles away in another country, without any ability to visit Dov, or

even communicate with him, on a regular basis.  No matter what the Court's view of Dov's

conduct might be, he does not deserve incarceration under these circumstances.

　　　　　In addition, if Dov were to be sentenced to any period of incarceration, upon

completion of his sentence under BOP custody, he will be transferred directly into ICE custody

and will stay unnecessarily incarcerated for additional weeks or months pending removal

proceedings, thereby further extending the inequitable duration of his time beyond bars as

compared to a similarly situated citizen.  (PSR ¶ 60).  Dov would be essentially serving a second

---

[5] Similarly, in 2014, the American Civil Liberties Union completed an investigation into these
noncitizen prisons in 2014 and found that "the men held in these private prisons are subjected to
shocking abuse and mistreatment."  (*See* Ex. GG ("Warehoused and Forgotten," American Civil
Liberties Union, June 2014, at 1-3, 16, 25-52); *see also* Ex. HH ("This Man Will Almost
Certainly Die," The Nation, Jan. 28, 2016, at 3).)   The ACLU reports that the prisoner
dormitories are nothing more than "Kevlar tents that each house about 200 men in bunk beds,"
are "crawling with insects" and are equipped with communal toilets that "overflow and always
smell awful."  (*Id.*)  The medical care at these facilities is dismal, without doctors or registered
nurses on site.  (*Id.*)  It can take weeks to get a prescription and prisoners die on a regular basis
from easily-treatable causes.  (*Id.*)  There are no workshops, or educational programs.  (*Id.*).

prison sentence, the length of which is entirely out of the control of this Court.[6]  We submit that

this is a meaningful consideration in deciding whether additional prison time in the United States

is merited here.  As Chief Judge McMachon remarked in *United States v. Connolly*, when

sentencing Gavin Black, a British citizen, who was convicted at trial for manipulation of the

LIBOR rate:

> If I could sentence Mr. Black to a term of incarceration -- a brief
> term of incarceration -- knowing that he would go to a facility
> appropriate to his criminal conduct, I would do it.  But I know that
> I can't.  I know that simply because he is a non[-]citizen -- and I use
> that term advisedly, he is not an illegal alien – [b]ut because he is a
> non-citizen, he will not be eligible to serve his sentence in the same
> way that any American citizen who stood convicted of this crime
> would serve.   And that's not right… -- for reasons I cannot
> comprehend, at the end of that term he could not walk out the door
> and be picked up by [his attorney] and taken to the airport.  He would
> be treated like an illegal alien, and he would be released into the
> custody of ICE, and at some point long after my intended sentence
> had expired he would be deported.  And that's not right. … I can't
> bring myself to impose a sentence of incarceration in the United
> States for Mr. Black.

(16-cr-370, [Dkt. 457] Sent. Tr. (Nov. 19, 2019) at 91:8–92:13).  Similarly, in *United States v.*

*Millul,* Judge Rakoff sentenced a defendant to less time in prison because, as an alien, he would

not be able to serve his time in a BOP camp and he would be subject to detention in an ICE

---

[6] To make matters even worse, the level of additional time behind bars that would follow a prison
sentence is likely to be served in deplorable conditions, thereby further exacerbating the undue
disparity in punishment that would result.  (*See* Ex. II, Department of Homeland Security, Office
of Inspector General Report number OIG 19-47 dated June 3, 2019 entitled "Concerns about ICE
Detainee Treatment and Care at Four Detention Facilities").  The Inspector General has
described a number of disturbing findings about the conditions at ICE detention centers,
including significant food safety concerns, inadequate medical care, improper punitive
segregation (including strip searching detainees who were being moved into segregation absent
an infraction), substantially subpar clothing, lack of basic supplies critical to the most basic
personal hygiene, dilapidated bathrooms permeated with mold and unusable toilets, nooses in
cells, and other dangers and violations.  (*Id.*)

facility prior to deportation. *United States v. Millul*, 18-cr-579 (S.D.N.Y.) (Rakoff, J.), [Dkt. 156] Sent. Tr. (Aug. 27, 2019) at 26:3-13. For the same reasons, Judge Weinstein held it was appropriate to sentence non-citizens to more lenient sentences because of the much harsher conditions of confinement faced by non-citizens. *US. v. Chin Chong,* No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y Sept. 24, 2014). Indeed, in Bryan Cohen's case, Judge Pauley remarked:

> In dealing with defendants who are foreign nationals like Mr. Cohen other judges have given consideration to the consequences attached to that status by the Bureau of Prisons. Foreign nationals, unlike similarly situated US citizens, are unable to serve terms of imprisonment in a camp or minimum security facility. And when foreign nationals complete a term of imprisonment they are transferred to ICE detention where they can wait for an indefinite period to be returned to their home country.

Ex R, *United States v. Cohen*, 19-cr-741 (S.D.N.Y.) (Pauley, W.), [Dkt. 48] Sent. Tr. (Jun. 9, 2020) at 42:4-12.

In conclusion, if sentenced to any term of incarceration, Dov will end up serving far more prison time than the Court orders and far more time behind bars than others who committed the same offense who are citizens, including other individuals related to this case.

### D.  A Sentence of Time Served Will Be More Than Sufficient To Achieve The Goals Of Specific And General Deterrence.

18 U.S.C. §3553(a)(2) requires this Court also to consider the need to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant," which courts have interpreted to mean both specific and general deterrence. *See Gupta,* 904 F. Supp. 2d at 352. It seems clear that there is no need for specific deterrence in this case. Dov is not a threat to the public. This is his first offense and an aberration in a life otherwise characterized by law-abiding behavior, as the many individuals who have wrote letters to the Court on his behalf can readily attest.

Dov has already paid an extremely high price for his actions.  He was incarcerated for more than eight-months in Swiss prison, where he was locked in a cell for 23 hours a day, and has served an additional five-months of home confinement thousands of miles away from his family.  While he was incarcerated, he missed his daughter's first steps, first words, and many other "firsts."  (PSR ¶ 54;  Ex. A-1 ("███, my baby girl, was 13 months old when I was arrested. Not yet walking or talking, just starting to react to the world, she was always smiling, always happy, and I was completely in love. In the 8 months I was incarcerated, I got to see my little ███ only once. One time. . . . . In those long months in prison, I have missed her first steps walking, running, missed her first words, so many words. I missed the first time she went to kindergarten or first time she ate by herself. So many other 'firsts' that I have missed out on forever.")).  "There is no more severe punishment for a parent than to miss your children growing up."  (Ex. A-19; *see also* Ex. A-35;  Ex. A-26).

This experience has had a tremendous impact on Dov's family and friends. Having seen the devastating effect his actions have had on his loves ones, the Court can rest assured that Dov will never fall on the wrong side of the law again.  The pain that Dov has caused to those around him and to himself serves as a lifelong lesson that he will never forget. (Ex. A-1 ("I have always tried to make people around me happy and have a positive influence, but over the last year I have brought nothing but immense amount of pain and sorrow on my family and friends. I have hurt the people I love most and will never forgive myself for putting them through this nightmare."); *see also* Ex. A-2 ("I know that his reflection and remorse for his actions has intensified so much, witnessing what he saw in prison and thinking about the unfortunate others . . . Dov's sincere remorse for his actions is significant.  I am convinced that Dov understands his mistakes and will not make again anything to slightly jeopardize his loved

38

ones being hurt.  My many conversations have convinced me of his steadfast willingness to take responsibility for his actions.");  Ex. A-34 ("Dov is extremely disappointed of himself for having caused so much pain and worries for his loved ones, disappointment for his parents and brothers.");  Ex. A-49 ("I am certain that during the long period of incarceration Dov has learned a meaningful lesson in an extremely painful way.  I have spoken to him and I am confident that his remorse and acceptance of responsibility is full and genuine.")).

Statistics also show that Dov is highly unlikely to be a repeat offender. Publications by the U.S. Sentencing Commission confirm that true "first offenders" like Dov, with no prior convictions or arrests, have an "extremely low recidivism rate."[7]  The U.S. Sentencing Commission has also reported that defendants convicted of fraud-related crimes are less likely to recidivate than defendants convicted of any other crimes.[8]

Understanding that the Court must also consider the needs of general deterrence when fashioning an appropriate punishment, we respectfully submit that the goals of general deterrence have already been achieved and that further prison time will not advance those goals. As discussed above, as of this filing, Dov has already served 8 months in prison under very harsh conditions, with an additional period of home confinement, and has been punished much more severely than the typical non-violent financial crimes offender.  Moreover, scholars have

---

[7] United States Sentencing Commission, *Recidivism And The "First Offender"* (May 2004), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf at page 17 (reporting a 6.8% recidivism rate for true first time offenders).  This study notably does not differentiate between different types of crime even though defendants convicted of fraud are the least likely to recidivate.

[8] United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (Mar. 2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2016/recidivism_overview.pdf at 20.

consistently concluded that it is the *certainty* of punishment, rather than its *severity,* that is the most effective deterrent for financial crimes.  *See United States v. Velazquez,* No. 16-cr-233, 2017 WL 2782037, *4 (S.D.N.Y. May 26, 2017) ("Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, increases in severity of punishments do not yield significant (if any) marginal deterrent effects . . . Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence.").  This is especially true with white-collar offenders.  *See,* Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes),* 58 Stan. L. Rev. 67, 80 (2005).  Thus, there is no empirical reason to believe that Dov's continued incarceration beyond the time he has already served will provide more effective general deterrence.  For example in *Chow,* Judge Woods determined that even a "short-term of incarceration," just three-months, would "be effective to dissuade others from engaging in similar conduct," without "being excessive in light of the other sentencing factors."  (Ex. P, Chow Sentencing Tr. at 80:3-13).

## CONCLUSION

Dov Malnik is a good man who has already been severely punished as a result of his conduct.  Dov has accepted responsibility for his actions and shown genuine remorse.  In light of Dov's exemplary character, acceptance of responsibility, extensive history of selfless acts and caring for others, the extreme hardship an additional period of incarceration would place on his wife and children, and the need to avoid unwarranted and significant sentencing disparities, we respectfully request that the Court sentence Mr. Malnik to time served.  We submit that—as the Probation Department has concluded—such a sentence is consistent with sentences imposed on similarly situated defendants, takes into account the particular

circumstances of Dov's case, and is "sufficient, but not greater than necessary" to achieve the

goals of criminal punishment under 18 U.S.C. §3553(a).

Dated:   New York, New York
         November 9, 2021

                                          **WILLKIE FARR & GALLAGHER LLP**

                                          By: _/s/_ Michael S. Schachter_____
                                          Michael S. Schachter
                                          Randall W. Jackson
                                          Jordan D. Reisch
                                          787 Seventh Avenue
                                          New York, New York 10019
                                          (212) 728-8000

                                          *Attorneys for Defendant Dov Malnik*