UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                    :
UNITED STATES OF AMERICA         :
                                                    :          S1 19 Cr. 714 (VM)
              -  v.  -                               :
                                                    :
DOV MALNIK,                               :
                                                    :
                              Defendant.    :
                                                    :
-------------------------------------------------------x


### THE GOVERNMENT'S SENTENCING SUBMISSION


                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York


Richard Cooper
Daniel Tracer
Assistant United States Attorneys
        - *Of Counsel* -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .......................................................................................................... 1

PROCEDURAL HISTORY............................................................................................ 4

DISCUSSION .............................................................................................................. 5

    Applicable Law ...................................................................................................... 5

    The Seriousness of the Offense ............................................................................. 6

    Unwarranted Sentencing Disparities ..................................................................... 8

    History and Characteristics of the Defendant ...................................................... 10

CONCLUSION........................................................................................................... 13

## PRELIMINARY STATEMENT

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Dov Malnik ("Malnik" or the "defendant") scheduled for November 19, 2021.

Malnik is a sophisticated investor and financial professional who shamelessly obtained and used material, non-public information ("MNPI") in order to make millions of dollars of illegal profits through insider trading.   During that time, Malnik well understood that the MNPI he was receiving came from inside corporate sources who were stealing that confidential information from their employers in exchange for illegal profit.   Malnik also took substantial steps to hide his criminal activity from law enforcement including by communicating about the MNPI over burner phones, conducting portions of his trading through offshore shell companies, and creating sham invoices to conceal the illegal transfer of crime proceeds.   Malnik then shared his illegal profits with his source of MNPI, Marc Demane Debih ("Demane") in order to continue this illegal trading scheme.

Accordingly, and for the reasons set forth below, the Court should impose a sentence of 37 to 46 months' imprisonment, a sentence within the agreed-upon range pursuant to the United States Sentencing Guidelines (the "Guidelines" or "USSG").   Such a sentence is sufficient but not greater than necessary to serve the legitimate ends of sentencing.

## BACKGROUND

Between 2013 and 2017, the defendant, and his business partner Tomer Feingold ("Feingold")[1] were securities traders who managed various companies and investment funds. (*See* 9/1/2021 Presentence Investigation Report ("PSR"), Dkt. No. 23, ¶ 18).   At all relevant times, Malnik and Feingold conducted securities trading both in their own names as well as through

---

[1]  Feingold is also a co-defendant in this case and is presently at large.

various corporate entities. (*Id.* ¶ 22).   Malnik and Feingold operated internationally, including conducting business from Switzerland, Hong Kong, Israel, and other locations.

Malnik began illegally receiving MNPI from Demane in or about 2013.   (*Id.* ¶ 19). During that summer, Malnik met Demane and learned that Demane had multiple sources of MNPI. (*Id.*).   Demane explained to Malnik that Demane was willing to share that MNPI with Malnik in exchange for compensation, and the arrangement they discussed was that Malnik would buy securities on Demane's behalf and then would transmit profits back to Demane.   (*Id.*).   Soon after that initial meeting, Demane explained to Malnik that Demane needed to be paid in cash so that Demane could, in turn, pay his sources of MNPI in cash.   (*Id.*).   Malnik agreed to this arrangement and over the following years received MNPI from Demane about multiple companies and multiple corporate transactions.   (*Id.*).   During that period, Demane in fact obtained MNPI from certain investment bankers who had access to MNPI about their employers' clients and shared that MNPI with Malnik.   (*Id.*).

Throughout his participation in the conspiracy, Malnik and others took substantial steps to conceal their illegal activity.   (*Id.* ¶ 20).   For example, Malnik communicated with Demane about the scheme through multiple, unregistered "burner" phones and over encrypted messaging applications.   (*Id.*).   Malnik also conducted portions of his insider trading via offshore shell companies.   (*Id.*).   At times, Malnik conducted insider trading in both his own name as well as through his corporate entities in close proximity, and in parallel to insider trading by Feingold based on the same MNPI.   (*Id.*).

As per their agreement, Malnik then transferred the proceeds of some of his insider trading back to Demane.   (*Id.* ¶ 21).   At first, Malnik directed that the funds be sent directly to a Swiss financial institution which maintained an account for the benefit of Demane.   (*Id.*).   After a short time however, Malnik's bank questioned the purpose of the transactions, and Malnik and Demane

arranged for Demane to issue fake invoices for purported consulting services to Malnik's offshore shell companies in order to justify the transfer of funds.  (*Id.*).  Malnik's offshore entities would then transmit funds back to the Swiss account held for Demane pursuant to the fake invoices. (*Id.*).

As further described in the PSR, Malnik received and traded based on the MNPI he obtained from Demane in connection with multiple companies.  (*See generally* PSR ¶ 22).  For example, in or about April and May of 2015, Malnik engaged in insider trading in connection with a publicly traded health care company called Omnicare, Inc. ("Omnicare").  (*Id.* ¶ 4). Specifically, Omnicare had retained a global investment bank (the "Bank") in connection with potential strategic transactions, and by in or about mid-March 2015, Omnicare had discussions about a potential transaction with at least approximately five other companies.   An employee of the Bank (the "Insider") then improperly accessed confidential files concerning Omnicare on the Bank's servers in late March and continuing through the middle of April 2015.   The Insider then passed information and updates gleaned from the Bank's servers, through a series of intermediaries, to Demane, who began purchasing shares of Omnicare in or about early May. Malnik and a number of the companies that he controlled likewise purchased shares of Omnicare through brokerage accounts that they maintained at Interactive Brokers.   On or about May 20, 2015, it was reported that Omnicare was in advanced talks to be acquired by CVS, and the following morning, on May 21, the merger was formally announced through a press release. These developments caused Omnicare's stock to increase.   Malnik earned over $100,000 from the stock increase in Omnicare following that announcement.

In total, Malnik earned over $2 million in illegal profits from his participation in this years-long insider trading scheme.   (PSR ¶ 23).

3

## PROCEDURAL HISTORY

The superseding indictment in this case was returned on February 26, 2020, and charged Malnik in 15 counts for his role in the above-described scheme.   On or about October 7, 2020, Malnik was arrested in Switzerland based on a request from the Government.   (PSR ¶ 25).   At the time of his arrest, Malnik was found to be in possession of approximately four cellphones. Following fully litigated proceedings and appeals in Switzerland, Malnik was extradited to the United States on or about June 10, 2021.

On or about June 25, 2021, Malnik pled guilty before United States Magistrate Judge Stewart D. Aaron to count nine of the superseding indictment, charging him with insider trading in connection with Omnicare.   As part of his plea, Malnik also admitted that his insider trading in Avanir Pharmaceuticals, Hyperion Therapeutics, Inc., and Pharmacyclics, Inc., constituted relevant conduct pursuant to Guidelines section 1B1.3.   This Court formally accepted the defendant's guilty plea on July 14.   (Dkt. No. 17).

The parties as well as the U.S. Probation Office agree on the Guidelines calculation in this case.   In particular, the offense level is 21 calculated as follows: a base offense level of 8 pursuant to USSG § 2B1.4(a); a 16-level enhancement based on a gain of between $1,500,000 and $3,500,000 pursuant to USSG §§ 2B1.4(b)(1) and 2B1.1(b)(1)(I); and a 3-level reduction for acceptance of responsibility pursuant to USSG §§ 3E1.1(a) and 3E1.1(b).   (PSR ¶¶ 32-42).   The defendant has no known criminal history.   Accordingly, the recommended USSG range is 37 to 46 months' imprisonment.   (*Id.*).   The parties have also agreed that forfeiture is warranted in the amount of $1,594,779 based on the defendant's gains.   (*Id.* ¶ 93).   Through its supplement to the PSR, the Probation Office has recommended a sentence of time served.   (PSR at 27).   In support of its recommendation, the Probation Office relies on two factors: *first*, that the defendant is "an industrious, driven, and family-oriented individual"; and *second*, that the defendant already served

4

approximately eight months in a Swiss jail prior to his extradition.   (*Id.* at 28).   The Probation Office also concluded that the prior sentences imposed on other defendants who were involved in this scheme, including Bryan Cohen (an insider who was sentenced to time served by Judge Pauley) and Telemaque Lavidas (a tipper who was sentenced to one year by Judge Cote), do not serve as fair comparisons to this case because of "the protracted length of [Malnik's] insider trading," and "the higher level of sophistication employed by Malnik vis-à-vis Cohen and Lavidas."   (*Id.*).

## DISCUSSION

The Government recommends that the Court impose a Guidelines sentence of 37 to 46 months' imprisonment.[2]   Given the lengthy and protracted nature of his offense, the sophistication and deception inherent in the crime, and the defendant's personal history and characteristics, this term of imprisonment is necessary to meet the statutory ends of sentencing, including just punishment, specific and general deterrence, and promoting respect for the law.   The defendant's request of time served would send the wrong message about the seriousness and wrongfulness of the defendant's conduct and would be contrary to the sentencing goals of 18 U.S.C. § 3553.

*Applicable Law*

Once the Court has calculated the applicable sentencing guidelines, it must consider an appropriate sentence under the totality of factors set forth under Title 18, United States Code, Section 3553(a).   While the Court must calculate the Guidelines, it is "emphatically clear that the Guidelines are guidelines--that is, they are truly advisory."   *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).   "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."   *Id.* at 188.   "A district court

---

[2]  The Government does not object to giving the defendant credit for the time he has already served in Swiss prison prior to his extradition.

may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id.* 189; *United States v. Genao*, 869 F.3d 136, 141 (2d Cir. 2017) ("The sentencing court must make an individualized assessment based on the facts presented.").

*The Seriousness of the Offense*

The crime that the defendant committed was very serious. The defendant engaged in a protracted course of illegal conduct over a multi-year period. Beginning in the summer of 2013, the defendant learned that he could gain an illegal edge in the stock market by obtaining MNPI from Demane. Based on this conversation with Demane, the defendant well understood that the MNPI he was getting was coming from insiders who had access to confidential information by virtue of their employment. And based on his professional experience and sophistication, the defendant understood that it was wrong and illegal to steal that information from firms like investment banks that were trusted with this confidential information. While the defendant did not directly steal the information from the inside sources, it was his willingness to pay for and repeatedly trade upon this information that facilitated and promoted this insider trading network. Following the summer of 2013 and continuing over at least approximately four years, the defendant repeatedly obtained MNPI from Demane in order to engage in insider trading in order to earn millions of dollars in illegal profits. This conduct evidenced a willingness to break the law over and over in order to line the defendant's pockets. Such conduct merits significant punishment at sentencing.

The defendant's criminal activity also has broader systemic consequences, including a tendency to undermine the integrity of U.S. financial markets. Rather than engaging in fair and legitimate investing activity, the defendant regularly used the illegal edge he was getting from Demane to guarantee himself millions of dollars in profits. This activity undermines the public

6

confidence in the fairness of financial markets and erodes the public's trust.   The Court should take these broader consequences into account in fashioning a sentence that is just and that promotes the rule of law.   It must send a message to the investing public that traders like the defendant will not be permitted to game the system to get guaranteed profits.

Moreover, the defendant engaged in this crime through repeated acts of evasion and deception.   First, the defendant used multiple, unregistered "burner" phones in order to hide from law enforcement and keep this conduct secret.   Second, the defendant engaged in his insider trading through numerous offshore shell companies, the beneficial ownership of which was hidden in foreign jurisdictions.   He employed these sophisticated strategies in order to gain greater profits through additional trading and to make that trading exceedingly difficult for law enforcement to track and trace.   In addition, the defendant used sham documents and invoices to facilitate payments to Demane.   Well aware that his banks would flag the conduct as suspicious, and perhaps even reject the transactions with Demane, the defendant lied to the banks in order to move illegal profits back to Demane and continue to fuel the scheme.   These actions show that the defendant's actions were not some momentary lapse or fleeting mistake; they were the actions of someone who knew what he was doing was wrong and took every precaution to evade detection. Sentencing in this case should be sufficient to account for this heightened level of culpability and the type of criminality evidenced by the defendant's actions.

The sophistication of this scheme, including the means described above, and others like it, make the crime of insider trading particularly difficult to detect and prosecute.   *See United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail.").   This conviction, the fourth to date in this larger

insider trading network, is the result of an investigation that has been ongoing for many years and has required the expenditure of significant law enforcement resources.  For that reason, when crimes like this one are uncovered and successfully prosecuted, it is critical that they serve as examples to other insider trading criminals and would-be criminals.  (*See id.*).   Here, the imposition of a significant term of incarceration is critical to that end.   It is that element of punishment that is necessary to effectively prevent people from engaging in such crime in the first place.  *Cf. United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[I]t is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence.").   Moreover, the sentence must be sufficient lengthy to achieve its goals, including just punishment and deterrence.  *See generally* USSG §1A1.1 (Policy Statement) ("Third, Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."); *Robles v. United States*, No. 14 Civ. 9311 (LAP), 2017 WL 1025993, at *3 (S.D.N.Y. Mar. 16, 2017) (noting that "a longer sentence" may be appropriate "given the seriousness of the offense" and "for the purpose of deterrence").

*Unwarranted Sentencing Disparities*

The defendant also argues that his recommendation of time served is warranted to avoid sentencing disparities.  This argument does not support a sentence of time served.  First, the defendant places substantial reliance on the sentence of time served imposed upon Bryan Cohen (an insider in this network who previously pled guilty) and the sentence of one year imposed upon Telemaque Lavidas (a tipper who also shared MNPI indirectly with Demane, among others, and was previously convicted after trial).   (Def. Mem. at 29-30).   These sentences, however, do not show that time served would be appropriate here.   First, as the Probation Department has properly recognized, the defendant engaged in this crime from a far more sophisticated perch than either

Cohen or Lavidas.   Cohen was a relatively junior investment banker who provided MNPI on a limited number of deals to Demane in exchange for cash.   Lavidas worked in his family pharmaceutical business and was trying to start a snack bar company when the crimes occurred and had very limited experience in securities trading.   While Lavidas's tips enabled millions of dollars in profits, his tips were limited to one company (Ariad Pharmaceuticals) and he derived relatively little personal benefit from the crime (good will and an investment in his snack bar company from one of Lavidas's friends and mentors).   The defendant, by contrast, has worked for years as a trader, banker, asset manager, and most recently the manager of a large investment fund.   (PSR ¶¶ 70-73).   Through his experience, he understood all facets of the insider trading network he willingly joined, including how bankers could get MNPI, how it was wrong to steal that information, and how the defendant himself could reap profits with that MNPI.

Second, Lavidas's and Cohen's sentences were driven predominantly by the time period during which they occurred.   Both Lavidas and Cohen were sentenced in the summer of 2020, just months into the COVID-19 pandemic and before the widespread approval and availability of vaccines.   (PSR ¶¶ 13-14).   For example, in sentencing Lavidas, Judge Cote specifically stated that her sentence would have been higher if not for the ongoing nature of the pandemic at the time of sentencing.   (7/2/2020 Sentencing Tr. at 59).   Under those conditions, the court gave great weight to the pandemic conditions in giving lower sentences than would otherwise have been warranted.   Times have shifted significantly since the summer of 2020.   While COVID-19 is still a concern, we are no longer living in dire times akin to the middle of 2020.   There are now widely available vaccines and many individuals across numerous professions are returning to work in person.   As vaccines become available to even greater segments of the population, the disruptions posed by the COVID-19 pandemic appear to be lessening and are poised to continue to do so.   By the time the defendant is designated, it will already be in or near 2022.   Given the passage of time

9

and the medical and societal progress achieved over the last year, the circumstances of the COVID-19 pandemic do not weigh in favor of a significant departure from the Guidelines in this case. Accordingly, the sentences imposed on Lavidas and Cohen do not support a below-Guidelines sentence in this case.



*History and Characteristics of the Defendant*

The defendant understandably spends the overwhelming majority of his submission focusing on his personal life and characteristics, rather than the facts described above. Without

detracting from the defendant's achievements in other aspects of his life, a couple of points are worth noting.   First, the defendant appears to have enjoyed a wholesome family life, is highly intelligent, and was an accomplished athlete and scholar.   (PSR ¶¶ 49-51).   These are not mitigating circumstances; they exacerbate the defendant's culpability.   Unlike others who appear before this Court for sentencing after living a life of limited opportunities, the defendant had every opportunity to achieve success ethically and lawfully.   Instead, he engaged in behavior he knew to be unlawful in order to line his pockets.   By the time of his arrest in Switzerland, the defendant was already earning nearly half a million dollars in yearly income and managing an investment fund.   (PSR ¶ 70).   And yet, he felt comfortable cheating and breaking the law to accumulate even more profit.   The only way to meaningfully deter people in his position from breaking the law in that fashion is to impose a meaningful sentence of imprisonment, specifically one within the Guidelines range of 37 to 46 months' imprisonment.

Finally, the defendant asserts that a non-custodial sentence is warranted based on a comparison to other insider trading cases in this District.   (Def. Mem. 32-34).   As the Probation Office notes, however, "comparing defendants is complex; each case presents a blend of unique personal characteristics and offense characteristics that make defendants and sentencings difficult to compare."   (PSR at 28).   As described above, the defendant is a particularly sophisticated and experienced financial profession who engaged in protracted criminal conduct through the use of deception.   Those circumstances warrant a serious penal consequence.   For example, in *United States v. Cameron Collins*, 18 Cr. 567, the defendant received a tip about only one company which resulted in the avoidance of losses.   (Def. Mem. at 32).   By contrast, the defendant received a steady stream of MNPI about numerous companies and used them to make millions of dollars.   In *United States v. Robert Stewart*, 15 Cr. 287, defendant Robert Stewart was the recipient of MNPI from his son, and while Robert Stewart received probation (Def. Mem. at 32-33), his son Sean

11

Stewart, the sophisticated investment banker at the heart of the scheme, did receive a 36-month custodial sentence after trial and then a 24-month sentence following a retrial.   Moreover, Sean Stewart received little personal pecuniary gain from his crime, and also did not utilize burner phones or other sophisticated means of deception.   Here, the defendant was a sophisticated participant and it was his willingness to pay for MNPI that motivated and enabled this large-scale insider trading scheme.   According, he should be given a serious custodial sentence.   *United States v. Rogiers* and *United States v. Zoquier*, also cited by the defendant (*id.* at 33), also involved less personal profit than this case and each received custodial sentences.   Moreover, Rogier and Zoquier were part of a larger insider trading network where other co-defendants, namely remote tippees who earned substantial profits, did in fact receive substantial sentences of imprisonment. For example, co-defendant Roberto Rodriguez (a remote tippee who helped generated millions of dollars in insider trading profits) was sentenced to one year in prison (Dkt. No. 146), and co-defendant Michael Siva (another remote tippee who helped generate millions of dollars in illegal profits) was sentenced to 18 months' imprisonment (Dkt. No. 148).   In sum, the fact that certain other insider traders have received probation does not show that such a sentence would be appropriate here.   Instead, the sentence should reflect the particular facts and circumstances of this crime – the defendant's involvement in a brazen international scheme to earn millions of dollars.   As such, a Guidelines sentence is warranted in this case.[3]

---

[3] The Court should also reject the defendant's argument about the conditions of confinement due to his status as a non-citizen.   (Def. Mem. at 34-37).   The defendant's argument would lead to a nonsensical "non-citizen bonus" whereby non-citizens would not be sent to prison because their conditions of confinement have, at times, been more onerous.   Moreover, the defendant's reliance on Black's sentencing in *United States v. Connolly* is misplaced.   In that case, Chief Judge McMahon, in describing the defendant's conduct, noted that "the defendants, these two men, were very minor participants in that crime."   (16 Cr. 370, Dkt. No. 457 (10/24/19 Sent. Tr.) at 86). Here by contrast the defendant played a central role in the scheme and made substantial personal benefit.   The defendant can also mitigate any concern that arise from the fact that he will be

## CONCLUSION

The Court should sentence the defendant to a Guidelines sentence of 37 to 46 months' imprisonment.

Dated: New York, New York
      November 12, 2021

                                Respectfully submitted,

                                DAMIAN WILLIAMS
                                United States Attorney

By:            /s/
                                Richard Cooper/Daniel Tracer
                                Assistant United States Attorneys
                                Tel. (212) 637-1027/2329

---

deported by consenting to the entry of a judicial order of removal that will order that he be removed from the United States promptly upon the completion of his sentence.